UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------X

SONIA FORDHAM and JOHN FORDHAM,

                            Plaintiffs,[1]                   **AMENDED**[2]
                                                                     **MEMORANDUM & ORDER**
                  -against-                         **08 CV 2310 (DRH)(WDW)**

ISLIP UNION FREE SCHOOL DISTRICT and
DIANE DRUCKMAN,

                            Defendants.
----------------------------------------------------------X

**APPEARANCES:**

**Reilly & Reilly, LLP**
Attorneys for Plaintiffs
170 Old Country Road, Suite 308
Mineola, New York 15501
By:    David T. Reilly, Esq.

**Cruser, Mitchell, & Novitz, LLP**
Attorneys for Defendants
175 Pinelawn Road, Suite 301
Melville, New York 11747
By:    Rondiene E. Novitz, Esq.
          Keith V. Tola, Esq.


**HURLEY, Senior District Judge:**

       This action was commenced under the Age Discrimination in Employment Act

("ADEA"), 29 U.S.C. § 621 *et seq.*, the New York State Human Rights Law ("NYSHRL"), N.Y.

---

[1] The only claim pertaining to plaintiff John Fordham is one for loss of consortium as a result of defendants' conduct towards his wife. (*See* Compl. ¶ 77-79.)  As this claim is entirely derivative of the primary claims in this action, *see Griffin v. Garratt-Callahan Co.*, 74 F.3d 36, 40 (2d Cir. 1996), the Court will focus in this decision on the claims pertaining to plaintiff Sonia Fordham, to whom the term "plaintiff" as used hereinafter exclusively refers.

[2] This Amended Memorandum and Order replaces and vacates the Court's prior Memorandum and Order dated August 8, 2012. (*See* docket no. 34.)  The present opinion alters the fourth and fifth unnumbered paragraphs of subsection IIa of the Discussion (entitled "The September 27, 2007 Incident"), which addresses plaintiff's *prima facie* burden as to the adverse-action element of her claim.

Exec. L. § 290 *et seq.*, and other state laws against plaintiff's former employer, the Islip Union Free School District (the "District"), and her supervisor, Diane Druckman ("Druckman"). In its September 11, 2009 Memorandum and Order, the Court granted defendants' motion to dismiss a number of claims pursuant to Fed. R. Civ. P. 12(b)(6), but allowed the action to proceed as to the ADEA and NYSHRL claims for retaliation against the District, the NYSHRL claim for retaliation against Druckman, and the state law claim for defamation. *Fordham v. Islip Union Free School District*, 662 F. Supp. 2d 261 (E.D.N.Y. 2009). Presently before the Court is defendants' motion for summary judgment under Fed. R. Civ. P. 56 as to all remaining claims. For the reasons that follow, defendants' motion is granted as to the ADEA and NYSHRL claims, and the Court declines to exercise jurisdiction over the defamation claim.

**BACKGROUND**

Plaintiff's retaliation claims arise from two incidents that occurred during her tenure as a first grade teacher at the Wing Elementary School in Islip, New York: (1) Druckman's alleged filing of a "child abuse report" against plaintiff, and (2) the District's denial of plaintiff's application for catastrophic medical leave. (Defendants' Statement Pursuant to Local Civil Rule 56.1 ("Defs.' 56.1") ¶ 3.) Plaintiff alleges that these acts were carried out in retaliation for her submission to the District, through counsel, of two letters dated July 31 and August 10, 2007 (hereinafter "discrimination letters"). These letters claimed that plaintiff had been subjected to age discrimination and harassment by Druckman. (*Id.* ¶¶ 3, 26.)

During the first charged retaliatory incident, which occurred on September 27, 2007, Druckman, in her capacity as school principal, conducted an informal "walk-through" observation of various classrooms. (*Id.* ¶ 36.) During this "walk-through," which was conducted

pursuant to a District-wide initiative (Druckman Dep. at 23), Druckman peered into plaintiff's classroom and saw her "approach C.A., a first grader in Plaintiff's class, take a water bottle from the child's hand, cap it, and tap the child on the head." (Defs.' 56.1 ¶ 38.) Plaintiff does not deny Druckman's recitation of the incident, except to suggest that it was more of a "pat" or "touch" on the child's head, rather than a "tap." (Plaintiff's Combined Response to Defendants' Statement of Facts Pursuant to Rule 56.1 ("Pl.'s 56.1") Resp. ¶ 40.) Plaintiff testified that she made contact with the child's head because the child "was not attending to what she needed to do," and "so she could refocus." (Defs.' 56.1 ¶ 42.)

In the weeks prior to this incident, the District undertook an investigation, headed by Ann Scricca, Esq. ("Scricca"), counsel to the District, to examine the issues raised in plaintiff's discrimination letters. While there is some dispute over the exact words used, Superintendent Alan Van Cott ("Van Cott") instructed Druckman to limit, in some manner, her contact with plaintiff during this investigation. (Defs.' 56.1 ¶ 35; Pl.'s 56.1 Resp. ¶ 35.) Purportedly in accordance with this directive, Druckman did not confront plaintiff directly regarding the classroom incident, but instead informed Linda Lippman ("Lippman"), the District's Assistant Superintendent for Human Resources, of the incident. (Defs.' 56.1 ¶ 47.) Druckman told Lippman that she did not think the child was in any danger, or that the incident constituted child abuse, but nevertheless felt that "tapping" a child on the head to restore her focus may not have been the best way to handle the situation. (*Id.* ¶¶ 44-45.) Lippman concluded that the administrators "had to meet with the child and parent to determine if the child felt uncomfortable or if, in fact, it was an unwelcomed tap." (Lippman Dep. at 82-83.) Lippman relayed the incident to Van Cott, who shared Lippman's view that the matter should be investigated. (Defs.' 56.1 ¶¶ 49-50.) Both administrators passed the information to Scricca, who interpreted the

incident as triggering the mandatory reporting requirements of Article 23-B of New York's Education Law, "Child Abuse in an Educational Setting." (*Id.* ¶ 51.) Lippman then directed Druckman to speak directly with Scricca regarding the incident. Scricca recommended that Druckman complete the Law's mandatory reporting form, but Druckman refused, believing that the incident was not serious enough to implement such measures. (*Id.* ¶ 56.) Lippman and one other District administrator, Ellen Semel, ("Semel") the Director of Curriculum, similarly felt that although the incident warranted investigation by the District, it did not trigger any mandatory reporting requirements. (*Id.* ¶ 57.) Lippman and Scricca instructed Druckman to memorialize her observations of the event in writing, which was seen by Druckman and Lippman only. (*Id.* ¶¶ 60, 62.) This report was not placed in plaintiff's personnel file. (*Id.* ¶ 68.)

As part of the District's internal investigation into the matter, Lippman met with the child and her mother on September 28, 2007, the day following the incident, before the start of the school day. (*Id.* ¶ 64.) The child confirmed that plaintiff's hand had made contact with the child's head, which she described as making her feel "like a hug from Mommy." (*Id.* ¶¶ 64-65.) The child's response reaffirmed the District administrators' view that the incident did not trigger mandatory reporting. However, Lippman and Semel followed up on the matter by discussing the incident directly with plaintiff. At that meeting, which plaintiff attended with a union representative, the two administrators discussed the event as it was relayed to them by Druckman, informed plaintiff of the meeting with the child, and communicated to plaintiff that tapping a student on the head was not the most appropriate or effective means of refocusing a student's attention. (*Id.* ¶ 67.) Plaintiff expressed her opinion that the incident in question did not warrant an investigation. Plaintiff faced no disciplinary action from the incident, and no indication that the event ever transpired was placed in her personnel record. (*Id.* ¶ 68.) During

this meeting, plaintiff became ill and appeared to start hyperventilating. (Lippman Dep. at 83.) She was taken to the hospital by ambulance and later administered psychiatric care. (Pl.'s 56.1 Resp. ¶ 69.) Her personal physician advised that she not return to work for the time being. (*Id.*)

The second incident of alleged retaliation arises from plaintiff's application to the District for catastrophic medical leave. Under the collective bargaining agreement ("CBA" or "contract") with the District, teachers who suffer from an incapacitating illness or injury may take up to 150 paid leave days, on top of any accrued sick days. (Defs.' 56.1 ¶ 71.) To qualify for such leave, the claimant must be suffering from an injury or illness which "by a group of three (3) physicians' recommendations (including the school doctor, attending doctor, plus one other to be selected at Board expense) makes it impossible for the person afflicted to continue working." (*Id.* ¶ 72.) Plaintiff submitted her application for catastrophic medical leave on November 19 or 20, 2007, (Def.s' 56.1 ¶ 69; Pl.'s 56.1 Resp. ¶ 69), citing a diagnosis by her psychiatrist, Margery N. Satish, of major depression and anxiety, which plaintiff claims began the date that she met with Lippman and learned of the allegations against her. (Pl.'s 56.1 Resp. ¶ 77.)

Francis Mazura ("Mazura"), who began as the District's Interim Assistant Superintendent in October 2007, responded to plaintiff's application by informing her that approval was subject to the medical opinions of three recommending doctors, as set forth in the CBA. (Defs.' 56.1 ¶ 79.) The letter further informed plaintiff that the District had selected the third doctor under that contract provision: a psychiatrist named Dr. Sameh Wahba. (*Id.* ¶ 84.) The other examining doctor pursuant to the contract, besides plaintiff's own physician, was Dr. Anthony Donatelli, the District's school physician. (*Id.* ¶ 82.) Drs. Wahba and Donatelli both determined that plaintiff was able to return to work. (*Id.* ¶¶ 83, 85.) The diagnosis of plaintiff's psychiatrist, Dr. Satish,

5

which was produced in plaintiff's initial application for leave, determined that plaintiff was not suitable to return to work for the next six months. (*Id.* ¶ 78.)

Mazura forwarded the three doctors' recommendations to Superintendent Van Cott for his review and recommendation to the District Board for a final decision. Because plaintiff's application did not include three doctors' recommendations in her favor, as required under the CBA, he recommended that the District Board deny her request for catastrophic leave. (*Id.* ¶ 87.) The Board later denied the application.

Plaintiff nevertheless contends that the District's processing of her application departed from its usual practice. Specifically, plaintiff cites testimony from Lippman that, notwithstanding the language of the CBA, the District did not previously require the opinions of three doctors prior to approval. Rather, the single opinion of the teacher's treating physician was sufficient to grant leave – a benefit that was "routinely granted." (*Id.* ¶ 79.) The practice of following the letter of the CBA and requiring the recommendations of three physicians purportedly began only after Mazura began his work with the District in October 2007.

Following the denial of plaintiff's appeal of the decision, the District met with plaintiff on several occasions to determine the date in which she would return to work. Ultimately, she was assigned a class for the 2008/2009 school year. (*Id.* ¶¶ 91.) Prior to her return, plaintiff met with Mazura and demanded a guarantee from him that she would not be harassed or discriminated against by anyone at the school. (*Id.* ¶ 91; Pl.'s 56.1 Resp. ¶¶ 91, 92.) Mazura responded that there was no way for him to offer such guarantees. (Defs.' 56.1 ¶ 91.) Mazura did, however, offer plaintiff a one-year leave of absence, which plaintiff initially accepted but later declined, opting instead to retire as of August 2008. (*Id.* ¶ 92.)

## DISCUSSION

### I. STANDARD OF REVIEW

Summary judgment should be granted where the pleadings and admissible evidence offered to the Court demonstrate "no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." FED. R. CIV. P. 56; *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008). An issue of fact is genuine if the "evidence is such that a reasonable jury could return a judgment for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008). Further, the relevant governing law determines which facts are material; "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248. Accordingly, where the undisputed facts demonstrate the union of all the required elements of a cause of action and no reasonable juror could find otherwise, the plaintiff is entitled to summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) ("Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case.").

A party may defeat a motion for summary judgment only "by coming forward with evidence that would be sufficient, if all reasonable inferences were drawn in [its] favor, to establish the existence of [an] element at trial." *Roe*, 542 F.3d at 36 (quoting *Grain Traders, Inc. v. Citibank, N.A.*, 160 F.3d 97, 100 (2d Cir. 1998)). The non-movant must advance more "than a scintilla of evidence," *Anderson*, 477 U.S. at 252, and demonstrate more than "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Conclusory statements in affidavits or allegations in the

pleadings are insufficient to defeat a motion for summary judgment. *Gottlieb v. Cnty. of Orange*, 84 F.3d 511, 518 (2d Cir. 1996).

## II. RETALIATION

The Court analyzes retaliation claims under the ADEA and the NYSHRL using the same "burden-shifting" formula from Title VII employment discrimination claims. *See Kessler v. Westchester Cnty. Dep't of Soc. Servs.*, 461 F.3d 199, 205 (2d Cir. 2006)(ADEA); *Apionishev v. Columbia Univ. in N.Y.*, 2012 U.S. Dist. LEXIS 8160 at *27 (S.D.N.Y. Jan. 23, 2012)(NYSHRL).

To make out a *prima facie* case of retaliation, plaintiff must establish "evidence sufficient to permit a rational trier of fact to find [1] that she engaged in protected participation or opposition under [the ADEA], [2] that the employer was aware of this activity, [3] that the employer took adverse action against the plaintiff, and [4] that a causal connection exists between the protected activity and the adverse action, *i.e.*, that a retaliatory motive played a part in the adverse employment action." *Kessler*, 461 F.3d at 205-06 (citation omitted).

"If a plaintiff sustains the initial burden, a presumption of retaliation arises. In turn, under the second step of the burden-shifting analysis, the onus falls on the employer to articulate a legitimate, non-retaliatory reason for the adverse employment action."[3] *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005)(citing *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 768 (2d Cir. 1998)). "[O]nce an employer offers such proof, the presumption of retaliation dissipates and the employee must show that retaliation was a substantial reason for the

---

[3] Plaintiff's opposition brief overstates defendants' burden by suggesting that they must "clearly establish . . . the non-retaliatory reason(s) for their actions." (Pl.'s Opp. at 16.) In fact, the employer's burden at this stage is merely one of production, wherein they need only "articulate" their non-retaliatory reasons for taking the alleged adverse action. *See Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 134 (2d Cir. 2000).

adverse employment action." *Id.* (citing *Fields v. N.Y. State Office of Mental Retardation & Developmental Disabilities*, 115 F.3d 116, 120-21 (2d Cir. 1997)).

Here, defendants concede that plaintiff has met the first two elements of her *prima facie* case, but argues that she has either not met the third or fourth elements, depending on the particular claim for retaliation.

### a. The September 27, 2007 Classroom Incident

Regarding the September 27, 2007 classroom incident, plaintiff alleges in her complaint that she was subjected to an adverse action in the form of Druckman's "false report of child abuse" against her. (Compl. ¶ 44; *see also id.* ¶¶ 39-46.) To establish that the actions taken against her were materially adverse for present purposes, plaintiff must show that such actions were "harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Burlington Northern & Santa Fe Ry. v. White*, 548 U.S. 53, 57 (2006); *see Carmellino v. Dist. 20 of the N.Y. City Dep't of Educ.*, 2006 U.S. Dist. LEXIS 63705 (S.D.N.Y. Sept. 6, 2006)(applying this standard to retaliation claims under the ADEA).

Defendants assert that the alleged conduct did not constitute a materially adverse action, arguing primarily that no report of child abuse was ever filed against plaintiff. Rather, Druckman witnessed the subject incident during a routine classroom observation exercise mandated by the District. (Defs.' Br. at 7.) Druckman conducted this exercise by peering through the classroom door window because she was directed to limit her contact with plaintiff during the District's investigation into the matters raised by her discrimination letters. Druckman concluded that the contact she witnessed between plaintiff and the child was not appropriate and, again because of her limited allowable contact with plaintiff, she reported the matter to District administrators. Defendants further note that Druckman never communicated to

these administrators that she believed plaintiff intended to harm the child, or that any mandatory child abuse reporting requirements were triggered. It was the School District's attorney, Scricca, who believed the incident triggered the state's mandatory reporting requirements. Despite counsel's opinion, Druckman refused to fill out a mandatory reporting form, as she believed the incident did not warrant such measures. After the meeting with the child, who described the contact as making her "feel like a hug from mommy," the administrators too were convinced that mandatory reporting did not apply. As a result, no report of child abuse was ever made, nor was any record of the incident entered into plaintiff's personnel file.

In her opposition memorandum, plaintiff appears to back away from the allegation in her Complaint that Druckman filed a "false report of child abuse." (*See* Compl. ¶ 44; Pl.'s Opp. at 9-10.) Indeed, there is no evidence in the record to support such an incendiary claim. Plaintiff nonetheless argues that the events that transpired after the classroom incident amounted to an adverse action. Most of this argument is made by way of hyperbole untethered to facts in the record, suggesting for instance that Druckman "exact[ed] her revenge" in a "grotesque show of power, domination and retaliation . . . [w]ithout any context as to the instructional and nurturing environment in [plaintiff's] classroom . . . show[ing] reckless disregard for the true nature of what she observed." (Pl.'s Opp. at 9.) These conclusory statements do not advance plaintiff's arguments that she was subjected to an adverse action.

Plaintiff also argues, however, that defendants conducted the investigation into the incident "in a manner that would best publicize this attack on [plaintiff's] character and fitness as a teacher" by pointing out that the interview with the child was conducted during the morning at an elementary school when parents, students, and other teachers are nearby. (*Id.* at 10.) The subsequent meeting between Lippman and plaintiff occurred later that same day after Lippman

10

found someone else to cover plaintiff's class. (Lippman Dep. at 81.) Here, plaintiff suggests that by making the meetings visible to others, particularly other teachers, defendants acted to dissuade other employees from engaging in protected activity themselves. For example, plaintiff states in her response to defendants' Rule 56.1 fact statement that "Lippman acknowledged that the facts of her investigation would get back to [plaintiff] and, one may infer, others at the school and in the community." (Pl.'s 56.1 Resp. ¶ 64.)

This asserted inference, however, is somewhat tenuous. It does not necessarily follow that if an administrator holds a series of meetings with a student, her parent, and her teacher, even if visible to other faculty members, that the subject matter of those meetings will become known to others. Nevertheless, plaintiff was certainly aware of the investigation, and, depending on the nature and severity of the matter, could be dissuaded from engaging in future protected activity herself. Given the character of the allegation here, *i.e.* that plaintiff may have made some form of inappropriate contact with a student, even the mere charge and investigation[4] into such an issue could raise the specter among plaintiff's peers of conduct more serious than what actually occurred. Although it is perhaps a close call, the existence of such allegations and the subsequent examination by the administration, alone, may well "dissuade a reasonable worker from making or supporting a charge of discrimination." *Burlington Northern*, 548 U.S. at 57. Plaintiff has therefore met her minimal burden to establish this element at the *prima facie* stage.

Turning to the causation element of plaintiff's *prima facie* case, plaintiff argues that Druckman reported her observations of the classroom incident within weeks of plaintiff's participation in protected activity. Specifically, the school's investigation into the discrimination letters, which were submitted on July 31 and August 10, 2007, led to an investigatory meeting

---

[4] It is undisputed that some form of investigation was undertaken by the District regarding inappropriate contact with a student. However, as is discussed in more detail *infra* at pages 13-14, it did not constitute an investigation of "child abuse" under Article 23-B.

between plaintiff and Scricca on September 12, 2007, just weeks before Druckman reported the classroom incident to administrators. Temporal proximity alone may suffice to establish a *prima facie* case for causation where proximity is very close. *Alston v. New York City Transit Auth.*, 14 F. Supp. 2d 308, 313 (S.D.N.Y. 1998)(citing *Manoharan v. Columbia Univ. College of Physicians & Surgeons*, 842 F.2d 590, 593 (2d Cir. 1988)). Given the relatively short amount of time between the protected activity and the alleged retaliatory act, plaintiff has met her *prima facie* burden to demonstrate causation.

Having determined that plaintiff has established her *prima facie* case regarding the classroom incident, the Court adverts to defendants' proffer of a legitimate, non-retaliatory reason for taking action. Druckman witnessed plaintiff making contact with a student's head with an "open hand" in order to refocus the child's attention. Plaintiff does not deny this version of the events. Defendants thereafter concluded that although this was not an incident of child abuse, triggering mandatory reporting, such touching was not appropriate and the incident nevertheless needed to be investigated.

It is when the burden shifts back to plaintiff to establish that this proffered rationale was a mere pretext for retaliation that plaintiff's case falters. It is well-settled that the temporal proximity that gives rise to an inference of retaliation, without more, is insufficient to satisfy plaintiff's burden of coming forward with some evidence of pretext. *Simpson v. N.Y. State Dep't of Civil Servs.*, 166 Fed. Appx. 499, 502 (2d Cir. Jan. 9, 2006) (summary order) (citing *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 770 (2d Cir. 1998)). "Indeed a plaintiff must come forward with some evidence of pretext in order to raise a triable issue of fact." *El Sayed v. Hilton Hotels Corp.*, 627 F.3d 931, 933 (2d Cir. 2010). Where the burden reverts back to plaintiff, "the presumption of retaliation dissipates and the employee must show that retaliation was a

substantial reason[5] for the adverse employment action." *Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010)(retaliation under Title VII). Aside from the relatively small time gap between plaintiff's participation in protected activity and defendants' allegedly retaliatory acts, plaintiff offers no evidence that could lead a reasonable juror to conclude that defendants' articulated rationale was pretextual.

Plaintiff attempts to change the tenor of defendants' acts by alleging in the complaint and arguing in opposition to the present motion that defendants acted under the rubric of an investigation for child abuse. One of the means by which plaintiff encourages this view of the facts is to point out where the defendants' investigatory measures resemble procedures set forth in Article 23-B, New York's Child Abuse in an Educational Setting Law ("Article 23-B"). (*See* Pl.'s 56.1 Resp. ¶ 60.) For example, plaintiff notes that District administrators received an "oral report" from Druckman regarding plaintiff's conduct and then immediately cites to §1126 of Article 23-B, creating the implication that Druckman submitted her account of the incident pursuant to that law. (*See* Pl.'s 56.1 Resp. ¶ 58.) However, there is no evidence that this law played any part in Druckman's decision to go to the administrators. That particular provision of Article 23-B covers "oral or written allegation[s] . . . that a child has been subjected to child abuse." (Article 23-B §1126.) Here, Druckman testified that she never considered this to be a matter of child abuse. In fact, when Scricca suggested that she complete a form pursuant to Article 23-B, Druckman refused.

---

[5] Defendants cite to case law under First Amendment retaliation for the proposition that plaintiff caries the burden to demonstrate that the adverse action "would not have been taken absent the employee's protected [activity]." (Defs.' Br. at 13-14 (citing *Morris v. Landau*, 196 F.3d 102, 110 (2d Cir. 1999)).) However, in the context of ADEA retaliation, following the Supreme Court's ruling in *Gross v. FBL Fin. Servs.*, 557 U.S. 167 (2009), courts are split on whether the "but for" standard or the mixed-motive standard applies. See discussion in *Mattera v. JPMorgan Chase Corp.*, 740 F. Supp. 2d 561, 578 n. 13 (S.D.N.Y. 2010); *see also* 5 Hon. Leonard B. Sand et al., *Modern Federal Jury Instructions (Civil)*, Inst. 88-28 (2012)(suggesting that the "but for" standard should apply in "equal force" to both ADEA discrimination and ADEA retaliation claims). Nevertheless, the Court need not determine which standard to apply in the present case because, as is evident in the discussion *infra*, plaintiff fails to carry her burden even under the lower standard.

In similar fashion, plaintiff suggests that the District's decision to speak with the child and her parents was undertaken pursuant to section 1128(3) of Article 23-B. (56.1 Stmnt. ¶ 58.) However, the cited provision pertains solely to the occasion where a school administrator possesses a "reasonable suspicion to believe that an act of child abuse has occurred." Article 23-B §1126. All three administrators involved, *viz.* Van Cott, Lippman, and Semel testified that this was not their belief, even before the interview with the student was held.

Plaintiff's citation to these provisions attempts to artificially cast Druckman's observations, and the District's response, in far more provocative terms than the facts allow. In reality, Druckman witnessed plaintiff making contact with the student's head with an open hand. Plaintiff admits to this version of the facts and adds that she did so because the child "was not attending to what she needed to do," and "so she would focus." (Fordham Dep. at 154-55.) Druckman, the principal of the school and plaintiff's direct supervisor, was faced with a difficult choice: report an incident which she believed implicated inappropriate physical contact with a student, or let the matter slide. The District administrators faced a similar choice in deciding whether to act on Druckman's report. Their view of the matter can be summed up in testimony from Lippman: "[A]n educator is not to touch a child in a way that is inappropriate and we needed to deem if, in fact, this touching, tapping was inappropriate." (Lippman Dep. at 60.) Indeed, the record lacks sufficient evidence to suggest that these administrators undertook to investigate an incident of "child abuse."[6]

---

[6] Plaintiff testified that she "believe[d]," without further specificity regarding her level of recollection, that Lippman informed her at the meeting that they were "conducting an investigation under [Article 23-B]." (Fordham Dep. at 150; see also Pl.'s Br. at 5.) The Court accepts this testimony, as it must, in the light most favorable to plaintiff, notwithstanding that Lippman herself testified that the meeting was called pursuant to her own "protocol," not Article 23-B (Lippman Dep. at 86). Nevertheless, plaintiff's testimony is not enough to raise a genuine dispute as to any material fact. As noted above, it is undisputed that no record of the incident, let alone that the incident may have implicated Article 23-B, was ever entered into plaintiff's personnel file. Moreover, plaintiff provides no evidence that the administrators ever viewed plaintiff's contact with the child as a matter of child abuse. Simply put, the proffered testimony amounts to no more than a "scintilla of evidence." *See Anderson*,

In sum, plaintiff has failed to demonstrate the presence of a material issue of fact that would permit a reasonable trier of fact to conclude that defendants were motivated by any factor beyond a generalized concern for the conduct of teachers in their classroom. Plaintiff could, for example, create an inference that retaliation motivated defendants actions "by showing that the employer subjected h[er] to disparate treatment, that is, treated h[er] less favorably than a similarly situated employee outside h[er] protected group." *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000). No such evidence is before the Court. Nor does plaintiff present any evidence that investigating such an incident was improper, or outside the District's normal investigatory procedures. *See*, *e.g.*, *Barney v. Consol. Edison Co.*, 2009 U.S. Dist. LEXIS 127178 at *50 (E.D.N.Y. Sept. 30, 2009) (granting summary judgment where plaintiff failed to produce evidence that defendant's investigation "deviated from normal procedures or that she was treated different from other similarly situated employees who had also been investigated") and *Vahos v. GMC*, 2008 U.S. Dist. LEXIS 47971 at *21 (E.D.N.Y. June 16, 2008)(same); *see also Kolesnikow v. Hudson Valley Hosp. Ctr.*, 622 F. Supp. 2d 98, 111 (S.D.N.Y. 2009)("[I]n the absence of evidence undermining [defendant's] assertion that it believed in good faith that [plaintiff's] conduct merited discipline and termination, or of any other evidence of pretext or discriminatory intent, [defendant] is entitled to summary judgment.").

Having failed to provide sufficient evidence that defendants' legitimate, non-retaliatory reasons for conducting an investigation into the classroom incident are pretext for retaliation, defendants are entitled to summary judgment on this claim.

---

477 U.S. at 252; *see also Schnabel v. Abramson*, 232 F.3d 83, 90 (2d Cir. 2000)(stating that an employer would be entitled to summary judgment "if the record conclusively revealed some other nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination occurred")(discussing *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133 (2000)).

### b. The Denial of Plaintiff's Application for Catastrophic Medical Leave

Defendants concede that plaintiff has met her *prima facie* burden on the first three elements of a retaliation claim, but contend that she has not put forth evidence that the denial of her request for medical leave was based on a retaliatory motive. (Defs.' Br. at 16.) Specifically, defendants state that the reason for denying plaintiff catastrophic medical leave lies in the relevant language of the CBA, which, as detailed above, requires three doctors to independently determine that it would be "impossible" for plaintiff to continue working. In fact, only one of the three doctors in plaintiff's case came to this conclusion, which precluded defendants, as far as the language of the CBA in concerned, from awarding plaintiff her requested medical leave.

Plaintiff does not contest this fact. Rather, she argues that by following the letter of the CBA and thereby requiring three separate doctor's opinions, defendants deviated from their normal practice. Plaintiff contends that prior to her application, only the medical opinion of the teacher's chosen physician was needed to grant leave. (Pl.'s 56.1 Resp. ¶ 79.) Plaintiff also notes that Lippman too applied for catastrophic medical leave in 2007. In that instance, however, although Lippman's application was also subject to the opinion of three doctors, plaintiff suggests that Lippman was permitted to select the third doctor herself, instead of having that doctor chosen by the District. (*Id.*) Plaintiff further points out that Van Cott testified that he could not "recall specifically that there was anyone else denied" catastrophic medical leave during the nine years that he served as superintendent besides plaintiff. (*Id.*; Van Cott Dep. at 128.)

Here, in contrast with the retaliation claim analyzed above, plaintiff proffers evidence that she was treated less favorably than a purportedly similarly situated individual that did not engage in protected activity, and that defendants deviated from their normal procedures in

evaluating applications for medical leave. Nevertheless, this evidence is not sufficient to establish that defendants' legitimate reason for the denial, *i.e.* that it was mandated under the CBA, was pretext for retaliation.

With regard to defendants' changed procedure for medical leave applications, the reason evidenced in the record for this change does not implicate a retaliatory motive. As noted above, in the fall of 2007 Lippman also applied for catastrophic medical leave, which was granted. She was replaced by Francis Mazura, who began as the District's assistant superintendent for administrative services in October 2007. (Mazura Dep. at 9.) Among his duties was the processing of teachers' applications for catastrophic medical leave, including plaintiff's own application. (Mazura Dep. at 10.) His introduction to that application process came by way of his own reading of the relevant CBA provision. (Mazura Dep. at 10.) He was given no other instructions regarding this process, except for what he describes as "generic" advice from Van Cott that he was to apply the provisions of the CBA as written, "whether it was attendance or grievances or leaves or supervision, evaluation, whatever." (Mazura Dep. at 11; *see also id.* at 15-17.) It is also clear from his testimony that while Mazura was aware of certain "issues" that the school had with plaintiff, he was not aware that she engaged in protected activity.[7] (Mazura

---

[7] Although Mazura effectively denied knowledge of plaintiff's protected activities, this fact alone is not necessarily dispositive of plaintiff's claim. As the Second Circuit stated in *Gordon v. New York City Bd. of Educ.*, 232 F.3d 111 (2d Cir. 2000),

> [t]he lack of knowledge on the part of particular individual agents is admissible as some evidence of a lack of a causal connection, countering plaintiff's circumstantial evidence of proximity or disparate treatment . . . . A jury, however, can find retaliation even if the agent denies direct knowledge of a plaintiff's protected activities, for example, so long as the jury finds that the circumstances evidence knowledge of the protected activities or the jury concludes that an agent is acting explicitly or implicit upon the orders of a superior who has the requisite knowledge. This is so, moreover, regardless of whether the issue of causation arises in the context of plaintiff's satisfaction of her prima facie case or as part of her ultimate burden of proving that retaliation played a motivating role in, or contributed to, the employer's decision.

17

Dep. at 27-29.) Therefore, the evidence in the record suggests that the change in procedure was the result of the District installing a new administrator—who simply followed the letter of the CBA without any knowledge of the District's prior practices—not the result of any intent to retaliate against plaintiff. Plaintiff's suggestion that Mazura "knew or should have known" of the prior application procedures is of no avail. Tellingly, plaintiff offers no authority to suggest that Mazura was under some obligation to inquire whether the District ever ignored the terms of the CBA. To the contrary, Van Cott instructed him generally that such terms are to be followed. Under these circumstances, the evidence of the District's change in the application procedure does not support plaintiff's argument for pretext.

Plaintiff next argues that Van Cott could not recall a single other case where a teacher was denied their application for catastrophic medical leave. As discussed above, plaintiff may advance her argument for causation by comparing herself to others who did not engage in protected activity and who were treated more favorably than herself. However, such an approach requires plaintiff to demonstrate that she was "similarly situated in all material respects to the individuals with whom she seeks to compare herself." *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000)(quoting *Shumway v. United Parcel Serv.*, 118 F.3d 60, 64 (2d Cir. 1997)). No such comparison is offered here. In fact, the record fails to even provide the identities of any individual that was granted medical leave, save for Lippman, and plaintiff makes no attempt to explain how she is similarly situated to Lippman in this context. Without this evidence, plaintiff has failed to carry her burden.

---

*Id.* at 117 (internal quotes and citations omitted).

As is discussed in more detail *infra*, no such circumstantial evidence has been provided, nor does the evidence militate in favor of causation even if Mazura's knowledge is assumed.

18

Finally, plaintiff argues that in Lippman's own application for leave, she was "given the opportunity to select the third doctor whose examination would be paid by the employer [whereas Plaintiff] was not given the same opportunity and was directed to the third doctor by Mr. Mazura." (Pl.'s Opp. at 11.) This account, however, mischaracterizes the facts. During the process of applying for leave, Lippman met with a counselor at the Employee's Assistance Program, which, as Lippman testified, "works for the [employee] as well as the school." (Lippman Dep. at 99.) That counselor made a recommendation for the third doctor, which "became the mutually agreed-upon doctor." (*Id.*) In plaintiff's case, the third doctor was selected solely by Mazura without input from plaintiff. Nevertheless, there is no evidence that this discrepancy was the result of retaliatory animus. To the contrary, Mazura's testimony demonstrates that he was unaware of plaintiff's protected activity. Moreover, plaintiff offers no explanation as to why she did not avail herself of the services of the Employee Assistance Program and select a mutually agreed-upon third doctor. The most probable explanation is that she did not know they offered such a service, but this is hardly evidence that defendants were motivated by retaliation in selecting a doctor for plaintiff. In any event, this incident is ultimately of no matter because the CBA requires that three doctors determine plaintiff's eligibility for medical leave. Even if plaintiff had selected the third doctor herself, and even if that doctor found that she should be granted medical leave, her application would still be denied because the second doctor, *i.e.* the District physician, still determined that she was not eligible.

As with plaintiff's arguments pertaining to the classroom incident, she has also failed to proffer evidence that retaliatory animus was a substantial motivating factor behind the denial of her medical leave. Defendants are therefore entitled to summary judgment on all of plaintiff's claims for retaliation under the ADEA and the NYSHRL.

19

### III. REMAINING STATE LAW CLAIM FOR DEFAMATION

Pursuant to 28 U.S.C. § 1367(c)(3), the Court "may decline to exercise supplemental jurisdiction" over a state law claim when the Court "has dismissed all claims over which it has original jurisdiction." The Second Circuit has repeatedly emphasized that when "federal claims are eliminated in the early stages of litigation, courts should generally decline to exercise pendent jurisdiction over remaining state law claims." *See Klein & Co. Futures, Inc. v. Bd. of Trade of the City of N.Y.*, 464 F.3d 255, 262 (2d Cir. 2006); *see also Kolari v. New York-Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006) ("'[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors . . . will point toward declining to exercise jurisdiction over the remaining state-law claims.'") (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988)). As discussed above, each of plaintiff's federal claims are dismissed and, therefore, the Court declines to exercise supplemental jurisdiction over plaintiff's remaining state law claim.

### CONCLUSION

For the above reasons, defendants' motion for summary judgment is granted as to plaintiff's claims for retaliation under the ADEA and NYSHRL which are dismissed with prejudice. Additionally, the Court declines to exercise subject matter jurisdiction over plaintiff's claim for defamation. The Clerk of Court is directed to close this case.

SO ORDERED.

Dated: Central Islip, New York
      August 13, 2012

                                                  /s/
                                          Denis R. Hurley
                                        United States District Judge